May it please the Court, I'm Count Watson, and I will be presenting the argument on behalf of all the appellants in this matter. The issue presented in this case is whether the Louisiana Oilfield Anti-Indemnity Statute can be validly applied to a plugging and abandonment operation that took place solely within the state territory of waters of Louisiana, or whether the application of that statute is preempted by the General Maritime Law. My client should prevail in this matter because, first of all, the activities were inherently local within the meaning of the Supreme Court decision in Kirby and a whole line of other Supreme Court cases dating back to the aftermath of Southern Pacific Company… Did you argue that in the district court? Your Honor, the – we argued around it, but I think it's… So that's a no? I mean tell me where you argued in the district court. Well, the argument that is made – the argument that is made by Carrizo in this case, first of all, it's not that they've never argued that we didn't raise it. They never raised the issue that it wasn't raised in the district court. In their letter brief, they argued that we didn't raise – that we raised it in our reply brief. I'm not worried about what they say. I just want to know did you raise it below? We never used the term inherently local in the district court. The law is – the argument they have made is that we raised it in our reply brief, and that is factually inaccurate. We raised it in our principle brief. We spent six or seven pages arguing the issue in our principle brief. The law in this circuit and in… But how do we reverse the district court on something you didn't argue below? The – well, the – you can reverse them on the – I mean this is a pure issue of law. That was – of course we're deciding the case. The other issue in the case is something that wasn't argued below as well because it was a change in the law. No, but the argument was made that whether it was maritime or state law was the whole issue below. Just the test is now different, but that issue was certainly what the judge decided under the old factors. Well, in – I mean the law in this circuit and every other circuit that has ever looked at the issue is that appellees, just like appellants, waive issues that they don't raise in their principle briefs. And the case in this – the case in this circuit is the United States versus Plinio Munchio where very similar facts. The appellant raised an argument on appeal for the first time. It was not raised in the court below. The appellee raised the waiver argument in a supplemental brief submitted to the court on a different issue, and the court held that the waiver argument had been waived. And the court said, quote, we reject the government's waiver argument for two reasons. It is unresponsive to our questions on supplemental briefing, and it was untimely. Just as we will not entertain issues first raised by an appellant in its reply brief, we will not consider new arguments raised by an appellee in supplemental briefing on unrelated issues. Accordingly, the government has waived its waiver argument, end quote. This court has continued to apply this rule, the United States versus Moody. I can provide these – the court – I don't know if the court wants a citation, but this rule has also been applied in the D.C. Circuit, the Second Circuit, the Seventh Circuit, and the Fourth Circuit. Why don't you move to the argument and we'll figure out if waiver has been waived or not. Thank you, Your Honor. The other arguments that are made by Carrizo on this argument are all without merit. They first argue that this issue had – the issue of inherently local has – was not raised in other cases involving Louisiana oil fielding and the Denver study. Most of the case law developed on this point before Curry was decided and reminded the bar that this was an exception to the general rule that the general maritime law preempts – governs maritime contracts. And, of course, the fact that other litigants didn't raise it doesn't prevent my client from raising it. The – Carrizo then quotes from language from the Lattawanna that was then again quoted by the Supreme Court in American Dredgen versus Miller for the proposition that application of state law would, quote, Note that both the Lattawanna and American Dredgen allowed the application of state law. They did not hold that state law was preempted. But by its terms, this language only preempts state law when the state law interferes with interstate or international commerce. And that is – the statute in this particular instance has no potential impact on interstate or international commerce. All of the activities took place within the state of Louisiana. In point of fact, I mean this – while this area where – the Delta Farms area where this activity was taking place, well, it is navigable in the sense that you can reach it by boat and that you can get out to the Gulf of Mexico. At one time – in one – in relatively recent history, this was dry land. The levee broke and then it filled with water. And the only – as far as we can tell, the only activity that takes place in this area is serving the small platforms with oil wells in this area. There's no – no one is going into this area and transporting goods in interstate or international commerce. It's difficult to imagine how plugging and abandoning operations in waters within the interior of the state of Louisiana would ever impact international or interstate commerce. And accordingly, that rationale does not apply. The argument was also made by Carrizo, and we pointed this out in our principle brief. We pointed out the case of Rod Ring v. Legro had held that the Louisiana oilfield anti-damage statute was preempted by the federal maritime law. To begin with, this case is not binding on this court. The issue in this case is an issue of federalism deriving from the grant of admitted jurisdiction in Article III of the Constitution of the United States and the question of whether the general maritime law that emanates from that grant of judicial jurisdiction preempts the right of the states guaranteed by the Tenth Amendment. And that is a federal issue, and the federal courts are the guarantors of the principles of federalism that are in the Constitution of the United States. More, Rod Ring was decided prior to the Supreme Court's decision in American dredging, and where the Supreme Court set forth what is meant by the characteristic features of the general maritime law. If you go back to all of this term, characteristic features of the general maritime law comes from sort of the fountainhead on preemption, which is Southern Pacific Company v. Jensen. In Southern Pacific Company v. Jensen, the Supreme Court stated that state law is preempted if, one, it contravenes the essential purpose expressed by an act of Congress, or, two, works material prejudice to the characteristic features of the general maritime law, or, three, interferes with the proper harmony and uniformity of that law in its international and interstate relations. Now, of course, there's no contention that the statute in question contravenes any purpose expressed by an act of Congress. Congress has never seen fit to regulate indemnity agreements. Congress has never seen fit to attempt to regulate oil and gas operations in state territorial waters. In point of fact, in passing the Submerged Lands Act, Congress expressly gave the states the right to manage, lease, develop, and use the submerged lands in state territorial waters in accordance with applicable state law. So far from prohibiting the state from regulating, it's authorized by Congress. As I've said, there's no interference with interstate or international commerce, which brings us to American dredging, where the— At your time's running down, are you going to spend any time on the Doran factors of establishing whether this is a maritime contract or not? Yes, Your Honor. Let me just very quickly deal with American dredging. The characters and features of the maritime law are limited to those aspects of maritime law that have their origin in maritime law or are unique to maritime law. And the notion that indemnity contracts are either one of these is non-existent. The general rule that indemnity agreements are enforceable, if properly written, comes—the first case, really, I can find is Trans-Fentanyl and Gas Pipeline, which is a case—and that case relied on Alabama law for that principle. And, of course, the best case I have on the issue in question is that—is Miller's Indemnity v. Breaux, which held that removing impediments to navigation, an activity that is heavily governed by federal law, was maritime but local and was subject to state regulation. The contract in question is not a maritime contract. Under the test set forth in Doran, first it has to be a contract to provide services to facilitate the drilling or production of oil and gas in navigable waters. Well, this wasn't drilling or production. This was plugging an abandonment operation to facilitate the removal of the platform. There are a long line of cases in this circuit to the effect that construction activities, offshore construction activities, are not—that is not maritime activity. And those cases—that issue was before the court—I didn't say before the court. I mean that issue was raised in Duran. And those cases are not even mentioned in Duran. So it—presumably those cases are—and also Duran, the en banc rehearing was granted to address the Davis and Sons factors. And Davis and Sons has never been applied to construction activities. I submit that these activities are much closer to removing a platform and the steps preparatory to that is much more akin to construction than it is to drilling or production. Secondly, the wells involved in this case were located on fixed structures. And the contract addressed did not involve, quote, the drilling or production of oil and gas on navigable waters. The phrase drilling or production of oil and gas on navigable waters, navigable waters obviously modifies the drilling or production. And in this case the wells were located on fixed platforms. The fixed platforms have always been considered an extension of land. If you—in Roderig, the other Roderig case, Roderig v. Ethnic Casualty and Insurity, the Supreme Court in determining whether the Death on the High Seas Act or the state law applied on an offshore platform, the Outer Continental Shelf, pointed out that fixed platforms have always been considered an extension of land. And accordingly, activity on a fixed platform is not maritime commerce. Finally, the vessel did not— The warrant itself was a fixed platform case, wasn't it? And yet it was decided on the second element. It was decided on the third element. It was decided on the question of whether there was substantial involvement of the vessel. Right. Okay, I thought that was the second element. And the court never discussed— Don't worry about the numbering. The court never discussed—the court never discussed whether this was—the first two items that I've just discussed. Finally, the vessel did not play a substantial role in the completion of the contract. The—you have to—the court at some point is going to have to decide what is substantial. Judge Davis gave us a head start in talking about the Jones Act and the 30 percent. And I've seen both sides are putting some quantities in their briefs, whether it's 89 percent or 11 percent or 36 percent. What numbers do you want to throw at us as to the involvement? I think the number ought to be which predominates, which is the most important. That would comport with the Supreme Court's language in Kirby where they say principle, objective, primary. All the other circuit courts that have addressed this issue have used that language. It has to be primary. The— We haven't used that language, though. I'm sorry, Your Honor? That's not the language we use, though, and we have an in-bank opinion. So why don't you deal with that opinion? Well, it—obviously, it has to be consistent. This Court's opinion has to be consistent with Kirby. It should work with Doron, and we'll figure out if it's consistent with Kirby. The—it also would be consistent—to say majority would also be consistent with Grand Isle Shipyard, where the court said where does the majority of the work take place. In this particular case, the platform-related activity consisted—was the majority of the work. The crew spent only 11 percent of their time doing work that was related to the vessel as a vessel, and most of that time was spent in movement of the vessel where the crew was on board just for the ride. And this court in Doron has expressly said that you don't consider people just riding from one work site to another. The only direct evidence as to where the majority of the work took place was the testimony of Mr. Millender, who said that most—the crew spends most of its time on the platform because that's where the well is. Also, the cost of the vessels was the minority part of this job. In that—and that was also in Doron. The court said that when work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel, but the relative importance and value of the vessel-based work to completing the contract. And here, that was a—most of the work was not the marine spread, but the plug-in to banding equipment and the plug-in to banding crew. You know, as to whether it's a—whether it's a—what substantial should mean. Most of the issue—a number of these cases have arisen in the context of marine insurance in the other circuits. And if you imagine a situation where you have an insurance policy on a marina, and 60 percent of the premium was for insuring the buildings and the piers and the docks, and 20 percent was for the hulls of the boats that the marina rented to people, and 20 percent was for protection and indemnity insurance for those vessels. Forty percent is marine risk. Sixty percent is a—is a non-marine risk. The non-marine—the marine aspects would be—would not be incidental. They would not be—but they would not— I don't think any court would consider that a marine insurance policy when most of the premium was for insuring real estate. Thank you. General McReynolds for Carrizo Oil and Gas Incorporated. So let me start off by addressing the maritime and local exception. First of all, the rule about not advancing an argument at the appellate level that hasn't been advanced blows because if you're asking the district court's judgment to be reversed for a legal error, it's sort of unfair to that court to be examined for a legal error based on an argument that was never made. So that's the reason that we raised the point that you really shouldn't be considering this argument. But the bigger point on the substance of the argument is that to argue that this is a maritime and local statute is to concede that it's a maritime contract, which is what they spent most of the time with the district court in their original briefing arguing this is not a maritime contract. So they're going to concede it's a maritime contract. We're going to focus simply on whether it's maritime and local. Inherently local does not mean that the activities have to extend across the state's borders because the nature of the application of general maritime law is coterminous with the grant of admittance jurisdiction under the Constitution, and it has been the law of admittance law in this country since at least 1851 when the Supreme Court decided Genesee Chief v. Fitzhugh that the admittance jurisdiction extends, and I'll just quote it for you. All waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable in interstate or foreign water commerce, whether or not the particular body of water is wholly within a state or whether or not the occurrence or transaction that is the subject matter of the suit is confined to one state. So the fact that this is work that is done on three wells located in the navigable waters of Louisiana is not determinative of whether or not it's an inherently local statute. So the issue of whether it's maritime and local has to be understood in the context of which that was explained by the Supreme Court in the Cossack case, the 1961 decision. And the issue there was whether or not an oral agreement to provide restitution in case a seaman was given substandard treatment in a public hospital in New York was valid under the maritime law. And the argument that was made that it wasn't was because the New York statute of frauds did not recognize the validity of an oral contract. And Justice Harlan in the Cossack said that is not, that statute is, it cannot be enforced. The state statute can't be enforced because the nature of the general maritime obligation that is being recognized is recognized under general maritime law as a valid and enforceable contract. And that was the basis for the analysis by the Supreme Court in the Kirby case, which said whatever state interest there may have been in the land portion of the rail carrier after the equipment was unloaded from the ship in Georgia wasn't enough to override the federal interest because a state statute that can be accommodated without defeating a federal interest can be given effect. But when it defeats a federal interest, which in Cossack was the enforceability of a valid oral contract, or in Kirby, which was the enforceability of a valid bill of lading, then it can't be enforced. The state statute can't be enforced because it defeats a federal interest. So they're not arguing the application of the Oilfield Indemnity Act to be accommodated within the confines of maritime jurisdiction. They're acting of maritime law. They're asking you to defeat it because these indemnity provisions in these contracts are enforceable under federal maritime law. You've got 30 years of case law in this circuit, starting with Corbett in 1981, through Terrio in 1986, through Lewis and Grendel in 1990, and Davis and Sons in 1990, all interpreting indemnity provisions just like these in contracts held to be maritime that were enforceable in the face of the Indemnity Act, which was not enacted until 1981. So to argue that it's an inherently local statute ignores 38 years of case law in this circuit, and, of course, it overlooks the fact that the Supreme Court itself, when Judge Dennis was then Justice Dennis, issued its decision in 1990 in Broderick v. LaGrosse that did an extensive analysis of the law statute and said it is not a maritime and local statute. So let's put that issue aside. We disrupted some settled law not too many months ago with the embankment opinion. We'll try not to do it too often, but… Let's hope you don't do it here. So really on the substance of the issues in this case, this is the perfect case that's a companion to the decision you just issued in Dwaron, because Dwaron articulated a new test that cleans up what it considered to be tort clutter and the Davis and Sons factors and focused on the nature of the contract itself to determine is it maritime and does it involve the substantial use of the vessel. So in Dwaron, in that case, you wrote it, the original opinion. The original opinion that drew such overwhelming support that it was vacated embankment. That's right. It went the other way. The contract there was not a maritime contract, and the reason was because the parties never anticipated the use of the vessel and carrying out the work on the platform. This case, in contrast to that, this contract could not have been performed without the use of the vessel. This vessel that was designed and built and marketed by Press Energy Services was done for the specific purpose of carrying out this particular type of job in the navigable waters of Louisiana or any other Gulf Scope case that has oil wells like these. That was the whole purpose for the vessel and its support fleet and its crew, and the contract called for that vessel and its crew and its fleet to carry out this job. So the two questions that you raised in the new test under Dwaron was one. It's just answers to go to them. Does this work that was called for in this contract facilitate the drilling and production of oil and gas in the navigable waters? Now we argued in our original brief, and I'm going to restate it again, that taking out the well at the end of the production cycle of an oil and gas well is no different conceptually from the efforts to put it in. And if putting it in through the use of a vessel, whether a submersible drilling rig or a barge or whatever kind of vessel and a crew, is a maritime contract, then using a vessel like this one and its support fleet and its crew to take it out is a maritime contract. It cannot be accomplished without that. But to add to that, it's recognized in the regulations that before an oil company can begin operations to drill a well in Louisiana waters, it has to make financial provisions for the end cycle of that process. By putting up financial security to guarantee that it won't be released until the wells that it drills are at the end decommissioned, plugged and abandoned, and removed below the surface of the water. Well, you make some comparisons that this should be treated the same way as other parts of the life cycle of an oil and gas well offshore. But we still have the new test that both sides have been talking about. And so deal with whether the vessel is playing a substantial role in the activity. So first of all, all the work that was done on those three wells were done from the vessel. The vessel was used every day. Most of it had to use the crane. The crane was built on the barge for the purpose of carrying out the work, not only taking the equipment that was dismantled and putting it onto the materials barge, but also putting up the hoses that were used to run down the well to perforate so that they could bleed off the pressure in order to pour the concrete and plug them out. They used those vessels every day. The crew lived on those vessels. Mr. Scholder, the injured sailor, was the pump operator on the vessel and spent 75% of his time on board the OB-808. So you don't have to go into some detailed analysis of what percentage of time is necessary because the work was done with those vessels, by those vessels, every day of the job for the duration of the contract. But isn't the argument of the facts that the equipment was moved from the 808 to the platform, it was used on the platform itself in the same, at least the argument being made by the other side, in the same way it would have been done on shore, on dry land, the equipment is the same equipment. Wasn't it moved off the vessel, onto the platform, the equipment that was actually being used to plug and abandon the well? Some of the equipment that was on the vessel was put on the platform. The platform – let's get a conceptual idea of what this work was. This work was to dismantle that platform, to end it, cut it off, and move it all away. So that was done by the crew with that barge and the two barges, and it was moved every day from one well to another by the towing vessel, and the job could have been completed any other way. This notion about whether it could be done on land the same as it could be done on the ocean, anything that can be done on land can be done on the ocean. That's not a meaningful analysis or a meaningful distinction in my view. Well, as you're trying to figure out whether this is a maritime contract, it may be meaningful. What is the meaning of the 89 percent that the other side is talking about? Was you disagree with the number or that 89 percent of the work was – I completely disagree with the number. The whole analysis is skewed and improper. What do we say is a substantial use of the vessel? The contract could have been done without the vessel. A necessary element of the contract is not necessarily substantial. Well, I don't necessarily agree with that distinction. It also has the word anticipated accented in it. Say that again? The word anticipated use is also accented in this analysis. Well, the analysis is under the second question. Did the parties contemplate the use of the vessel? That's a friendly observation. I think this is plainly – the use of the vessel here was anticipated from the outset. It was not something that came in on the facts of doing it. The parties call for the use of this vessel in carrying out this work. It was contemplated in the contract. The contract wasn't executed until the bid was submitted that called for the use of this vessel. This was the whole purpose of the contract. So, I mean, so you've got two questions. One, did it facilitate oil and gas?  Well, and did the parties contemplate the use of the vessel in the contract? Yes, they did. Well, contemplate that it would play a substantial role in the completion. Say that again? I'm sorry. Well, part of that analysis is did they contemplate it would play a substantial role in the completion of the contract. So not just that it – everybody knew there would be a barge. Our whole issue here is is it a significant enough role to qualify under our test. So let me respond to that with an observation. So the Davis and Son case was very much similar in the factual pattern to this case, where they had a barge that was called for in the contract and went out there. But they weren't doing P&A work. They were doing maintenance work on fixed platforms. And the court went through the same analysis of whether or not it was a vessel substantially, integrally related to the carrying out of the vessel's mission and carrying out the work. So would the Davis and Son result be different under the Duaron test or no? See, I submit that it would not be different, that this – Do you want me to answer that question or – No, I'm saying that – no, I don't want you to answer that. I'm making an argument that the Davis and Son result, the decision, would not be different under the Duaron test because the vessel was – the barge at issue there was used in carrying out the maintenance obligations of the contract on those vessels. In other words, the parties contemplated the use of that vessel to carry out that work, and the work could have been done without the use of that vessel. These things are sticking out in the water. They're not even accessible by anything other than a vessel, unless you fly with a helicopter. But, I mean, this is a maritime operation to kill these wells through the use of a vessel and her crew that was called for and contemplated by the parties. It could have been carried out without the vessel. It could have been carried out without the crew. I mean, in many ways it wasn't called this, but it was very much like a charter, like a charter contract, where they hired the crew and the vessel to go out and do the job. Those are always – they've never been considered anything other than a maritime contract. The fact that they might have used – been on the platform sometimes in order to run the wires down into the well itself. Remember, they had to use the crane to move those wire lines. The crane was located on board the barge. They had the crane operator on the barge working on it. So carving up the amount of time it took to do the actual wire line services, that's irrelevant to the analysis of the issues before you, in my view, in our argument. Unless you have any other questions, I will ask that you affirm the judgment. First of all, with regard to the waiver issue, the opposing counsel made the comment that the purpose of the rule that generally requires an appellant to preserve the issue, raise the issue in the district court, said it was to be fair to the district judge that doesn't commit legal error. That is not the reason for the rule. The principal reason for the rule is so that facts can be developed in the district court. The courts have said repeatedly – this court has said repeatedly that even when an issue is not raised, and this court puts aside the issue of waiver by the appellee, the courts will be – are inclined to hear issues on – raised for the first time on appeal when they're pure issues of law. And, of course, the issue of inherently local maritime but local is a pure issue of law involving the Constitution of the United States. Also raised the issue about saying that the waters – what waters are subject – What case law says you can – we ordinarily will hear legal issues if they're raised for the first time because they don't require – Nielsen v. Moss Point, 674 Fed 2nd, 379. USX v. Tannenbaum, 868 Fed 2nd, 1455. And the rule is stated as that the court will consider issues that haven't been raised below when refusal will – when they're pure issues of law and when refusal to do so will lead to an incorrect result. And with regard to the waters subject to jurisdiction, the point is not – the question – we are not questioning whether this was a – these were waters subject to jurisdiction. But the court – since the beginning of the republic, the courts have held that the states have considerable power to regulate maritime affairs. That assumes that the waters are subject to jurisdiction. Are you conceding this is a maritime contract? Your argument sure sounds like it. Well, I'm not conceding that that's a maritime contract. But even if it were a maritime contract, the states still have considerable power to regulate maritime contracts. That has always been the law. Well, you're so desperate to get this back landward. I'm sorry. Go ahead. Well, I will agree with Judge Aikenbotham that you're focusing so much on inherently local. I do get the sense that you think Doron helps you. Why don't you try to explain to us how you can succeed even under Doron? Well, Your Honor, I mean, for one thing, with regard to my suggestion to this court that substantial ought to be viewed as the most important. There ought to be – the problem we had with Davison Sons was the test was so malleable that it could be – there was no predictability for the court, for parties, for lawyers, and particularly problematic for parties who are trying to structure their contracts. And if substantial – unless substantial is giving some real concrete meaning, we're going to be right back where we were with Davison Sons. The test this court came – put forward in Grand Isle Shipyard, which is if the majority of the work takes place on the platform, it's an oxlocytis. That test is certain. It's something that can be determined. It can be determined from work records of where the people were actually working. And similarly, if that test is used to determine – But to focus on the language of the ad hoc opinion, it says a substantial role, R-O-L-E, role. And that doesn't – it's not necessary to me to translate into a cost allocation of various functions, et cetera, because it may be that less work was – or the work exceeded that particular one. It is a substantial role. And that's been a tough road for you to hoe in this case. I read these facts. That's why I really think we need to focus on that. That's the language of it. And to answer that by saying, well, this is only – 85 percent of the cost was over there, so it doesn't play a role in it, you couldn't have done this without the vessel. I mean, that's the – so you have to answer that in this situation. Why isn't that a substantial role? I'm not suggesting an answer to it. I'm just trying to zero in on where we are. We have an ad hoc opinion that's down here, and you're hardly talking about it. And it's just very new, and I think it controls this case. But I'm only one. Well, clearly it controls the case, but the – Your time is about up.  Thank you, Your Honor. The – again, I would also add that making the test – this issue is going to come up on the Outer Continental Show. And it is going to – and if the court were to adopt the Grand Isle shipyard test, you would have confluence between the test for what is an oxalocytis and whether the contract is maritime. It would greatly simplify litigation on the Outer Continental Shelf to have those two tests be used. I could adopt a new test in this opinion in light of the in-bank opinion. So under the Doron test and the footnote that follows it, the part that Judge Higginbotham referred to, we will not only consider the time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract. And he has his footnote about 30 percent. Jones Act is at least a starting point for future case law. Help me with that. How does – how do you work your contract under that system? Well, of course, that's merely – that was merely – I read that footnote. It's a suggestion. The 30 percent is a suggestion. The other is not a suggestion. We should consider the time spent but also the relative importance and value of the vessel-based work. Well, in this case, the vessel-based work was, I would submit, relatively insignificant compared to the work done on the platform and the work – and what was contributed to this job by the plugging and abandoning equipment, which, as Your Honor indicated, was used both on fixed platforms and on – where there wasn't room would stay on the vessel. There was nothing inherently maritime about this equipment. This same equipment could have been used on a land job. And that was what Carrizo was paying Crescent for. That was the majority of what they were paying for. All right, Counsel. Thank you. Thank you very much. We will get back to you as soon as possible. We'll take a brief recess.